

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00241-CV

_____

RICHARD WYLIE JR.; KSW CPA, P.C.; HMSW CPA, P.L.L.C.; AND
CHEREE BISHOP, Appellants

V.

DAN SIMMONS, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-255831-11

Before Gabriel, Kerr, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

This case arises out of Dan Simmons's July 2008 sale of his accounting practice to the then-newly-formed Simmons & Wylie, P.C.—an entity controlled by Richard Wylie Jr. and now known as KSW CPA, P.C.—for almost $1.2 million. Both parties to the purchase agreement breached it, and Wylie stopped paying on two promissory notes given as part of the purchase.

Simmons sued Wylie and KSW, and they countersued. While the suit was pending, Wylie transferred KSW's assets to HMSW CPA, P.L.L.C., and Wylie's stepdaughter Cheree Bishop purchased HMSW. After a multiday trial, a jury found mostly in Simmons's favor, and the trial court signed a judgment awarding Simmons damages, interest, and attorney's fees against Wylie, KSW, HMSW, and Bishop, jointly and severally.

Wylie, KSW, HMSW, and Bishop have appealed and raise 13 issues. Their first five issues allege charge error; issues six through ten challenge the sufficiency of the evidence supporting various jury findings on liability, damages, and attorney's fees; issues 11 and 12 assert that the trial court erred by imposing joint and several liability against Wylie, KSW, HMSW, and Bishop; and the final issue alleges that the trial court made erroneous discovery rulings. Because Simmons was required to segregate his attorney's fees but did not, we will reverse that part of the trial court's judgment awarding him attorney's fees and remand for a new trial on attorney's fees. And because the trial court erred by holding Wylie, KSW, HMSW, and Bishop each jointly

and severally liable for damages and interest, we will reverse and render judgment against the appropriate parties. We will affirm the rest of the trial court's judgment.

## I. Background

Simmons is a certified public accountant who started his accounting practice in 1982. By 2007, his Arlington-based firm Simmons & Associates of Texas, P.C. had four employees and was generating about $1.1 million in annual revenue. But after 35 hectic years in the public-accounting business, Simmons—then 55 years old— decided he wanted to sell the firm to give him more time to spend with his family, to travel, and to pursue other business interests. So in May 2007, Simmons listed his firm with Accounting Practice Sales, a brokerage firm that specializes in accounting-firm sales.

Wylie, a certified public accountant and owner of the Arlington-based accounting firm Kiblinger & Wylie, P.C., responded to the broker's listing. Wylie, who had started his firm in 1994, was looking to "capture" a share of the Arlington accounting market. To that end, he had purchased two other Arlington accounting firms in the two years before he responded to the broker's listing for Simmons & Associates.

In March 2008, Wylie and Simmons started negotiating the sale's terms. At first, Wylie was concerned "about whether [Simmons] was really going to get out of public accounting" because Wylie feared that if Simmons continued to work as an

accountant, his clients would follow him. To mitigate that risk, Wylie insisted on a noncompete agreement.

During the sale negotiations, Simmons was diagnosed with the blood disorder polycythemia vera. Simmons disclosed this diagnosis to Wylie, and according to Wylie, Simmons represented that his condition would prevent him from continuing to practice public accounting and that he had "no plans to go back into public accounting." Simmons, however, claimed that his condition did not play a significant role in his desire to sell the firm: he had already decided to sell it when he was diagnosed.

In July 2008, the parties entered into a Purchase Agreement in which Simmons & Wylie, P.C.—a newly formed professional corporation owned by Wylie—purchased all Simmons & Associates' stock; the bulk of its tangible assets; all its intangible assets; and the "[c]ustomer lists, client records, client work papers, tax and accounting files, . . . the associated goodwill of Dan Simmons, CPA, and of the professional accounting practice of [Simmons & Associates] as a going concern to the identified clients and customers as identified in Exhibit A." The parties to the Purchase Agreement—Simmons & Wylie (but not Wylie individually) and Simmons individually—had agreed on a $1.167 million purchase price, with Simmons & Wylie

4

paying Simmons $900,000 at closing.[1] As part of the purchase, Wylie, individually and on Simmons & Wylie's behalf, delivered two promissory notes payable to Simmons: one for $267,000 and the other for $100,000. The former was part of the purchase price, and funds from the latter were used to pay closing costs and to operate Simmons's practice in its current offices until Wylie was able to move the practice to his Center Street office building, which was being renovated at the time.

The Purchase Agreement required Simmons to provide accounting and administrative services to Simmons & Wylie for a year after closing to help transition his practice to its new owner. Specifically, Simmons agreed "to take all reasonable action and do all reasonable things necessary to facilitate acceptance of the merger by [Simmons's] accounts and retention of [Simmons's] accounts." In return for Simmons's work during the transition period, Simmons & Wylie agreed to pay Simmons as outlined in the Purchase Agreement.

The Purchase Agreement also included a covenant not to compete that prohibited Simmons from (1) directly or indirectly engaging in or establishing "an office for the purpose of engaging in [the] public accounting business" within Tarrant and several surrounding counties for two years after the Purchase Agreement's closing date, and (2) "except insofar as the restrictions are for the benefit of [Simmons &

---

[1]These funds were provided through a Small Business Administration loan from Community Bank. This loan was partially secured by Wylie's office building, which was owned by Center Street, Ltd., another Wylie-controlled entity.

Wylie],” soliciting or accepting any business from the clients listed on Exhibit A for five years after the closing date. But even with these covenants, Simmons & Wylie expressly agreed that it was assuming the risk of client attrition. (“The Buyer herein agrees and understands that the Seller does not warrant, in any way, any future business after Closing of any client or customer that is the subject of this Agreement.”)

As agreed, Simmons worked for Simmons & Wylie after closing, and in September 2008, Simmons moved his practice into Wylie’s Center Street office building. In late 2008, Kiblinger & Wylie and Simmons & Associates entered into a partnership agreement[2] effective January 1, 2009, to form Kiblinger, Simmons & Wylie, LLP, which began generating its own set of clients.[3] In February 2009, Wylie started making promissory-note payments to Simmons as scheduled.

But during the year-long transition period after the closing date, the relationship between Wylie and Simmons soured. Simmons claimed that after he moved his practice to Wylie’s Center Street offices, there were “multiple technological issues and operational issues that created difficulty . . . for everybody” and that “friction” developed between him and Wylie during the 2009 tax season. Wylie

---

[2]Wylie executed the partnership agreement as the president of both Kiblinger & Wylie and Simmons & Associates.

[3]No assets were transferred to Kiblinger, Simmons & Wylie but each partner made cash capital contributions to the new partnership.

accused Simmons of not transferring all the assets and not taking the necessary steps to transfer his practice to Simmons & Wylie; Simmons accused Simmons & Wylie of not paying him for all his accounting services. But despite these difficulties, in the year following the sale Simmons & Wylie generated over $1.2 million in revenue from Simmons's former clients.

As anticipated, Simmons left the practice in July 2009. In December 2009, he formed Dan G. Simmons CPA, PLLC in anticipation of opening a CPA firm when his two-year noncompete expired in July 2010. At that time, the new PLLC did not have an active office, and Simmons did not market or advertise the business or conduct business under the PLLC's name. Two days before the two-year noncompete expired, Simmons changed the firm's name to Simmons & Associates of North Texas, PLLC because he had hired a CPA to start working for the PLLC.

That same month—July 2010—Wylie changed Simmons & Wylie's name to KSW CPA, PC, and KSW purchased Kiblinger, Simmons & Wylie's clients, along with its outstanding receivables and other assets. KSW also assumed about $650,000 of debt in the transaction.

In fall 2010, Wylie stopped making promissory-note payments, testifying at trial that he had stopped paying because Simmons had not performed his contractual obligation to "transition the clients" and had "embarked on a course of activity that actually caused clients to leave." Wylie claimed that as a result of Simmons's actions,

7

Simmons & Wylie lost many of the 900 clients listed on Exhibit A in the year following Simmons's departure, which resulted in about $400,000 in lost revenue.

Simmons testified that the missed promissory-note payments had such a financial impact on him that he had to develop "additional income to pay all of [his] bills." Simmons thus sent out mailers to gin up some accounting business, but he insisted that he had excluded from the mailing list "as best [he] could, all of the clients that were sold to . . . Wylie." But after Wylie stopped making payments in fall 2010, Simmons began accepting calls from former clients and began performing accounting services for a few of the Exhibit A clients.[4] At trial, Simmons admitted to providing accounting services to approximately 20 former clients (which comprised about 36 entities) between 2009 and the time the five-year noncompete expired in July 2013. According to Simmons, he had "every intent to honor [the] noncompete agreements," but those 20 former clients contacted him "in the fourth year or fifth year, for the most part, after the sale to . . . Wylie."

Because of client attrition and the resulting loss of revenue, Wylie realized at the end of 2010 that his business could not service its debt. He then merged Kiblinger & Wylie and Kiblinger, Simmons & Wylie into Center Street, which declared bankruptcy in June 2011. In October 2011, Simmons sued Wylie.

---

[4]At trial, however, Simmons admitted to doing accounting work for at least one former client nearly a year before Wylie had stopped paying on the notes.

In March 2012, Wylie formed HMSW CPA, P.L.L.C., which was a combination of the names KSW and Marrou, Hagen & Adkens, P.C., another Arlington accounting firm Wylie had acquired sometime after he purchased Simmons & Associates. According to Wylie, no assets were transferred to HMSW at that time, but cash contributions were made to it. In December 2015, KSW's clients were distributed to Center Street, which distributed them to Wylie, who transferred them into HMSW.[5] At that time, Wylie was an 80% owner of HMSW, and Dan Hagen owned the remaining 20%. Bishop—Wylie's stepdaughter and herself a certified public accountant—purchased HMSW for $252,000. At trial, Wylie agreed that this transaction was "basically a sale of all of the clients [he] had purchased in the past to [his] daughter."

At the time of trial in August 2018, Simmons had alleged claims against Wylie for breach of the promissory notes and against KSW for breach of the Purchase Agreement.[6] Simmons also alleged that KSW and HMSW were Wylie's alter egos and asserted a fraudulent-transfer claim against Wylie, KSW, HMSW, and Bishop. Simmons further pleaded for damages, attorney's fees, pre- and postjudgment interest,

---

[5]These clients included the clients purchased from Simmons & Associates and from other accountants.

[6]Simmons alleged that Wylie owed him almost $760,000 in principal and interest on the two promissory notes and that KSW owed him about $28,000 for the professional services he had performed for Simmons & Wylie in the year after he sold his practice.

and court costs. Wylie and KSW countersued Simmons for breach of the Purchase Agreement; unfair competition, misappropriation of name, and conversion; common-law fraud; fraudulent inducement; tortious interference; and breach of fiduciary duty.[7] Wylie and KSW pleaded for injunctive relief to enforce the noncompetition provisions, damages, attorney's fees, pre- and postjudgment interest, and court costs.

After a nearly week-long jury trial, the trial court directed a verdict against Wylie and KSW on their fraud claims based on Simmons's representations during the sale negotiations. The jury found that Simmons and KSW both breached the Purchase Agreement but that Simmons's breach was excused. The jury found that Simmons suffered $26,412.20 in damages as a result of KSW's breach. The jury further found that Simmons had breached the five-year noncompete provision in the Purchase Agreement[8] but determined that Simmons's breach had not damaged KSW. The jury also found that Wylie had breached both promissory notes and awarded Simmons $758,528.57 in total damages for those two breaches. Having determined that KSW's breach was not excused and that Wylie had failed to pay the promissory notes, the

---

[7]Center Street intervened in the suit, and Wylie and KSW also asserted third-party claims against Simmons & Associates of North Texas and other Simmons-controlled entities (D.S. Family, L.P.; Financial WoRx, Ltd.; and Sekure Connect, Ltd.). Center Street did not recover any relief, and Wylie and KSW did not recover on their claims against the Simmons-controlled entities. No appellate issues have been raised regarding these parties and claims.

[8]The jury found that Simmons had not breached the two-year noncompete provision.

jury found that Simmons's attorney's fees were $195,000. Finally, the jury found (1) that Wylie had fraudulently transferred KSW's and HMSW's assets; (2) that KSW had fraudulently transferred its and HMSW's assets; (3) that Wylie was responsible for KSW's conduct under an alter-ego theory; and (4) that Wylie was responsible for HMSW's conduct under an alter-ego theory.

Before the trial court could sign a final judgment, KSW and HMSW filed for bankruptcy, which stayed the case. *See* 11 U.S.C.A. § 362(a)(1). The bankruptcy court modified the stays to allow the case to go forward, and Simmons successfully moved to reinstate the case in March 2019.

Based on the jury's findings, the trial court signed a final judgment ordering that Simmons recover the following from Wylie, KSW, HMSW, and Bishop, jointly and severally: $784,940.77 in actual damages; $195,000 in attorneys' fees; pre- and postjudgment interest; and taxable court costs. Wylie, KSW, HMSW, and Bishop timely moved for a new trial, which the trial court denied.

Wylie, KSW, HMSW, and Bishop (collectively, the "Wylie parties") have appealed.

## II. The Jury Charge; Evidentiary Support for the Jury's Findings

The Wylie parties attack the jury charge in their first five issues and challenge the sufficiency of the evidence to support various jury findings in their sixth through tenth issues. Because some of the charge-error issues hinge on evidentiary sufficiency, we address these issues together.

## A. Standards of review

### 1. Charge error

We review for an abuse of discretion a trial court's decision to submit or refuse a jury question or instruction. *Fort Worth ISD v. Palazzolo*, 498 S.W.3d 674, 683 (Tex. App.—Fort Worth 2016, pet. denied) (citing *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)); *see Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 619 (Tex. App.—Fort Worth 2011, pet. denied) ("A trial court has wide discretion in submitting instructions and jury questions."). When feasible, jury questions should be in broad form and must be accompanied by "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010) (quoting *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002)). A trial court must submit to the jury all questions, instructions, and definitions raised by the pleadings and the evidence. Tex. R. Civ. P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999). "A trial court may refuse to submit an issue only if no evidence exists to warrant its submission." *Palazzolo*, 498 S.W.3d at 683 (citing *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992)).

### 2. Sufficiency of the evidence

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of

law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Wylie's promissory-note breaches

The trial court submitted the issue of Wylie's promissory-note breaches separately from the issue of KSW's and Simmons's breaches of the Purchase Agreement. The jury was asked whether each party's breach of the Purchase Agreement was excused, but they were not asked that about Wylie's promissory-note breaches. In their first issue, the Wylie parties complain that the trial court abused its discretion by not submitting a question that would have permitted the jury to find that Wylie's performance on the notes was excused by Simmons's breach of the noncompetition covenants in the Purchase Agreement.[9]

---

[9]Simmons argues that the Wylie parties waived this issue by submitting to the trial court a proposed final judgment rendering judgment against Wylie for $758,528.57 for breach of the promissory notes. *See, e.g.*, *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 322 (Tex. 1984) (disapproving of "a practice by which a party, by motion, induces the trial court on the one hand to render a judgment, but reserves in a brief the right for the movant to attack the judgment if the court grants the motion"); *Casu v. Marathon Ref. Co.*, 896 S.W.2d 388, 389 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (op. on reh'g) (holding that a party could not attack a judgment on appeal after having moved to enter judgment without qualification and did not express any disagreement with the judgment's content or result). Here, the Wylie parties submitted a proposed judgment with their response and objections to Simmons's motion for entry of judgment, which stated in relevant part:

> Although Defendants submit a proposed Final Judgment . . . which better reflects the jury findings and the applicable law than does the proposed Final Judgment submitted by Plaintiff, Defendants do so only subject to and without waiver of the objections they have raised at trial, including during the charge conference, including, but not limited to, the lack of evidence to support any finding of fraudulent transfer or lack of sufficiently distinct corporate identity involving KSW CPA, P.C., the omission of a jury question regarding excuse of performance in

14

Generally, when one party to a contract materially breaches that contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). "A prerequisite to the remedy of excuse of performance is that the covenants in the contract must be mutually dependent, so that the breach of a dependent covenant will excuse the injured party's performance of other dependent covenants." *Greenstein v. Simpson*, 660 S.W.2d 155, 160 (Tex. App.—Waco 1983, writ ref'd n.r.e.) (citing *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982)); *see Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 341 n.38 (Tex. App.—Fort Worth 2003, pet. denied) ("Generally, a party's breach of mutually dependent, reciprocal promises in a contract excuses performance by the other party."). "Whether covenants are dependent or independent must be determined by the parties' intent as evidenced by the terms of their agreement." *Greenstein*, 660 S.W.2d at 160. "[I]n case of doubt, the court will presume

connection with the promissory note executed by Defendant Richard Wylie, Jr., the omission of a jury question regarding fraud, the failure of Plaintiff's attorney to segregate his fees, and the like.

We conclude that through this language, the Wylie parties preserved their right to complain about the judgment on appeal. *See First Nat'l Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989) (stating that "[t]here must be a method by which a party who desires to initiate the appellate process may move the trial court to render judgment without being bound by its terms" and a party should include a reservation of rights in any such motion for entry of judgment); *Casu*, 896 S.W.2d at 390 ("To preserve the right to complain about a judgment on appeal, a movant for judgment should state in its motion to enter judgment that it agrees only with the form of the judgment, and note its disagreement with the content and result of the judgment.").

15

the promises are dependent rather than independent, since such construction ordinarily prevents one party from having the benefit of his contract without performing his own obligation." *Id.*

The Wylie parties rely on *Greenstein*, a case in which a retired partner in an accounting partnership sued his former partners to recover the balance due on promissory notes they had personally executed to purchase the retired partner's partnership interest. *See id.* at 157–58. The parties' partnership agreement provided for "the purchase by the partnership of a retiring partner's interest, the total consideration for such purchase being determined by a formula set forth in the agreement." *Id.* at 157. The partnership agreement also contained a noncompetition agreement that prevented a retiring partner from re-entering public accounting for a period of time. *See id.* After the retired partner re-entered public accounting, the former partners stopped paying the promissory notes. *Id.* at 158. The retired partner sued on the notes, and the former partners pleaded failure of consideration as a defense. *Id.*

The jury found that part of the consideration for the promissory notes was "the mutual understanding and belief" between the retired partner and the former partners that the retired partner was permanently retiring from public accounting and that the consideration partially failed because the retired partner had re-entered public accounting. *Id.* The jury also found that as part of the sale, the retired partner agreed to permanently retire from public accounting. *Id.*

16

Based on this latter finding, the Waco Court of Appeals concluded that the trial court could have reasonably concluded that the parties orally amended the noncompetition provision to make it coextensive with the retired partner's agreement to permanently retire. *Id.* at 159. The court further held that the evidence was sufficient to support the trial court's conclusion that the noncompetition agreement and the former partners' agreement to pay the promissory notes were mutually dependent promises:

> The record does not show the parties clearly indicated the non-competition covenant was to be considered an independent promise; however, the evidence is sufficient for the trial court to have reasonably concluded that [former partners] would not have purchased [retired partner]'s interest in the partnership without [retired partner]'s agreement to permanently retire from the practice of public accounting. The trial court could have reasonably concluded that [retired partner]'s agreement to permanently retire was the crux of the parties' agreement, since the interest in the tangible assets acquired through the purchase of [retired partner]'s interest was negligible. The covenants surrounding the transaction were intended to be mutually dependent, and any doubt as to such intent must be resolved against [retired partner].

*Id.* at 160.

Citing *Greenstein*, the Wylie parties assert that "the operative issue is whether the covenants between the parties to the main contract were dependent or independent." They further assert that "[w]here an individual or entity executes a promissory note as consideration in connection with a separate contract, failure of consideration provided in exchange in connection with that separate contract can excuse performance under the terms of the promissory note." Here, however, Wylie's promise to pay the

promissory notes and Simmons's covenants not to compete in the Purchase Agreement are not mutually dependent promises.

First and foremost, Wylie was not a party to the Purchase Agreement; Simmons & Wylie and Simmons were.[10] Wylie—on Simmons & Wylie's behalf—paid Simmons $367,000 by delivery of two promissory notes payable by Wylie to Simmons. Those promissory notes were independent promises to pay Simmons. Nothing in the Purchase Agreement or the promissory notes indicates that Wylie's payment obligations under the notes and Simmons's promises not to compete made in the Purchase Agreement were mutually dependent promises.

Moreover, the Purchase Agreement expressly states that the noncompetition provisions are independent of any other contract provision. Even though the Purchase Agreement makes clear that the noncompetition covenants were an essential part of the deal,[11] the parties expressly agreed that the noncompetition covenants

---

[10]The Purchase Agreement defined "Buyer" as "the professional corporation Simmons & Wylie, P.C. and its successors and assigns." Wylie does not assert that he is Simmons & Wylie's successor or assignee.

[11]Simmons expressly acknowledged in the Purchase Agreement that his compliance with the noncompetition covenants was "necessary in order to protect [Simmons & Associates'] goodwill, business interests, and proprietary and confidential information" and that a breach of the noncompetition covenants would "irreparably and continually damage [Simmons & Associates] to the extent that money damages may not be adequate." Simmons also agreed that the noncompetition covenants were "reasonable and necessary protection of the legitimate interest of Buyer's Affiliated Group" and that any violation of the noncompetition covenants "would cause substantial injury to Buyer's Affiliated Group and Buyer's Affiliated Group would not

were "independent of any other provisions of this Agreement, and the existence of any claim that [Simmons] may allege against any other party to this Agreement, whether based on this Agreement or otherwise, shall not prevent enforcement of these covenants." The covenants also contained their own remedies. The Wylie parties argue that these provisions were not for Simmons's benefit and "signified only that Simmons could not excuse his own performance under the provision, not the reverse." But the Purchase Agreement's plain language stating that the noncompete covenants are "independent of any other provisions of this Agreement" indicates that the noncompetition covenants were independent promises. *Cf. Hanks*, 644 S.W.2d at 708 (concluding that noncompetition covenant in sale-of-business contract was independent promise because the parties had assigned a monetary value to the covenant and there was "no express language in the contract that indicates the parties intended the covenants to be mutually dependent," noting that the breach of a noncompetition covenant that is part of an enforceable contract gives rise to a cause of action for damages rather than affecting the enforceability of the contract's other provisions).

---

have entered into this Agreement with [Simmons] without receiving this additional consideration of [Simmons]'s binding himself to said restrictions." The "Buyer's Affiliated Group" was defined as "collectively and individually," Kiblinger & Wylie, Simmons & Wylie, Simmons & Associates, and "any and all successors and assigns of their professional practices of public accounting and consulting."

We thus hold that the trial court did not abuse its discretion by not submitting a question that would have permitted the jury to find that Wylie's performance on the promissory notes was excused by Simmons's breach of the noncompetition covenants in the Purchase Agreement. We overrule the Wylie parties' first issue.

## C. Simmons's breach of the noncompetition provisions

The Wylie parties complain in their second issue that the trial court abused its discretion by not instructing the jury that Simmons's breach of the noncompetition provisions could not be excused. They assert that such an instruction was warranted because the Purchase Agreement expressly provided that the noncompetition covenants were "independent of any other provisions of this Agreement, and the existence of any claim that [Simmons] may allege against any other party to this Agreement, whether based on this Agreement or otherwise, shall not prevent enforcement of these covenants."[12]

We first address whether the Wylie parties have preserved this complaint for appellate review. Simmons contends that they have not because they did not ask for a jury instruction that Simmons's performance under the noncompetition provisions could not be excused and did not object to the trial court's failure to include such an

---

[12]The question of Simmons's breach of the two noncompetition provisions was submitted to the jury separately from his alleged breach of the Purchase Agreement. The jury found that Simmons breached the five-year but not the two-year noncompetition provision.

instruction. To preserve a complaint regarding an omitted jury instruction, the instruction's proponent must request and tender to the trial court a substantially correct instruction in writing. *See* Tex. R. Civ. P. 278 ("Failure to submit a[n] . . . instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct . . . instruction has been requested in writing and tendered by the party complaining of the judgment."). If the requested instruction is refused, the trial court must "endorse thereon 'Refused,' and sign the same officially." Tex. R. Civ. P. 276. The Texas Supreme Court has stated that "a written refusal is not always necessary to preserve error, [but without one] the aggrieved party must show that the trial court was aware of the party's request and denied it." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 830 (Tex. 2012); *see Dall. Mkt. Ctr. Dev. v. Liedeker*, 958 S.W.2d 382, 387 (Tex. 1997) (stating that "[t]o make an endorsement by the trial court the exclusive means of preserving error for refusing a charge request, when the court's refusal is otherwise clear from the record, would promote form over substance and be ill advised" and holding that "an endorsement by the trial court is not the exclusive means of preserving error for refusing a charge request").

Here, the Wylie parties filed a proposed jury charge that included an instruction that Simmons's performance under the noncompetition provisions could not be

21

excused by any other party's failure to perform under the Purchase Agreement.[13] In advance of the charge conference, the trial-court judge prepared a proposed charge that he and the parties used during the conference to formulate the final charge. This proposed charge is not in the appellate record, and its absence has made our review of the charge conference challenging. But from reading the discussions during the charge conference alongside the Wylie parties' proposed charge, it appears to us that the trial court had included the Wylie parties' requested instruction in its proposed charge. Simmons objected to the instruction's inclusion, and the trial court sustained that objection. We thus conclude that the Wylie parties preserved this complaint for our review.

Although the Wylie parties preserved this complaint, we conclude that the trial court did not abuse its discretion by refusing to instruct the jury that Simmons's performance under the noncompetition provisions could not be excused. The fact that a party's alleged breach cannot be excused is essentially "built in" to the compliance question, which asks simply if a party failed to comply with the agreement. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury*

---

[13]We assume without deciding that the proposed instruction was substantially correct. *See* Tex. R. Civ. P. 278; *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987) ("[S]ubstantially correct . . . does not mean that it must be absolutely correct, nor does it mean one that is merely sufficient to call the matter to the attention of the court will suffice. It means one that in substance and in the main is correct, *and that is not affirmatively incorrect*." (quoting *Modica v. Howard*, 161 S.W.2d 1093, 1094 (Tex. App.—Beaumont 1942, no writ) (emphasis added))).

*Charges: Business, Consumer, Insurance & Employment* PJC 101.2 (2018). The issue of excuse becomes relevant if a party is attempting to avoid performance based on the other party's prior material breach. Prior material breach is an affirmative defense that, if proved, excuses a party from further performing under the contract because of the other party's prior material breach, *see* Tex. R. Civ. P. 94; *Mustang Pipeline*, 134 S.W.3d at 196–97, and is submitted to the jury in a separate question, *see* Comm. on Pattern Jury Charges, *supra*, PJC 101.21, 101.22. Here, Simmons was not seeking to avoid performance under the noncompetition provisions based on any other party's prior material breach, so the jury was asked only whether Simmons failed to comply with either the two-year or the five-year noncompetition provisions. The Wylie parties' proposed no-excuse instruction would not have helped the jury in answering this question, and the trial court thus did not abuse its discretion in refusing the instruction. We overrule the Wylie parties' second issue.

## D. Wylie and KSW's fraud and fraudulent-inducement claims

The Wylie parties contend in their third issue that the trial court abused its discretion by not submitting a question that would have allowed the jury to find that Simmons had "committed fraud and/or fraudulent inducement" against them. The Wylie parties assert that the evidence supported submitting this issue to the jury because Wylie had purchased Simmons's firm based on Simmons's false representation that he would not re-enter the public-accounting business because of his blood disorder.

23

As noted, the trial court directed a verdict against Wylie and KSW on their fraud claims based on Simmons's representations during the sale negotiations. But the Wylie parties do not challenge the trial court's directed-verdict ruling; they state this issue in terms of charge error, arguing that the trial court should have submitted fraud or fraudulent inducement to the jury because both were raised by the evidence. Charge error and directed-verdict error are separate issues triggered by separate rulings and reviewed under separate review standards. *Salazar v. Sanders*, 440 S.W.3d 863, 873 (Tex. App.—El Paso 2013, pet. denied). A "challenge to a jury charge does not necessarily raise a challenge to a directed verdict as a proper subsidiary issue" under Rule 38.1(f), so the issue must be raised separately. *Id.* at 873–74; *see* Tex. R. App. P. 38.1(f). But rather than finding this issue inadequately briefed, we will construe it as a challenge to the trial court's directed verdict on Wylie and KSW's fraud and fraudulent-inducement claims because if the trial court's directed verdict was proper, it had no duty to charge the jury on these claims. *See Salazar*, 440 S.W.3d at 873–74.

A trial court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to its right of recovery or when the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A directed verdict is appropriate when reasonable minds can draw only one conclusion from the evidence. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d

480, 483 (Tex. 1984). In reviewing the granting of a directed verdict, we follow the standard of review for assessing the evidence's legal sufficiency. *Cox v. S. Garrett, L.L.C.*, 245 S.W.3d 574, 578 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the party against whom the verdict is directed. *Id.*

To prevail on their fraud and fraudulent-inducement claims, Wylie and KSW had to prove (among other things) that they actually and justifiably relied on Simmons's representations. *See, e.g., Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (stating that fraudulent inducement is a "species of common-law fraud that shares the same basic elements" and "arises only in the context of a contract"); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (op. on reh'g) (stating that fraud requires a showing of actual and justifiable reliance). Justifiable reliance usually presents a fact question for a jury to decide. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019) (citing *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)).

"In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton*, 314 S.W.3d at 923 (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). Justifiable reliance can "be negated as a matter of law when circumstances exist under which reliance cannot be

25

justified." *Orca Assets*, 546 S.W.3d at 654. "To determine whether, as a matter of law, justifiable reliance has been negated, we must consider the contract and the nature of the parties' relationship." *Barrow-Shaver Res.*, 590 S.W.3d at 497. Reliance on an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *See Orca Assets*, 546 S.W.3d at 658, 660 n.2. "Red flags" that indicate reliance is unwarranted can also negate justifiable reliance as a matter of law. *See id.* at 655, 660 n.2.

Here, Simmons had already decided to sell his business and was negotiating with Wylie when he was diagnosed with polycythemia vera in May 2008. Simmons disclosed this diagnosis to Wylie, and according to Wylie, Simmons represented that his condition would prevent him from continuing to practice public accounting and insisted that he had "no plans to go back into public accounting." Wylie testified that he relied on these representations in deciding to purchase Simmons's firm.

But Wylie's reliance was not justifiable. Not only did the Purchase Agreement require Simmons to provide accounting services to Simmons & Wylie for a year after the sale's closing, its two- and five-year noncompetition provisions allowed Simmons to re-enter the accounting profession—and Wylie admitted at trial that he knew when he signed the Purchase Agreement that Simmons could re-enter the public-accounting market after two years. Given these Purchase Agreement provisions and that Wylie was a sophisticated business owner who had already bought two other accounting firms, we conclude that his alleged reliance on Simmons's statements about returning

26

to the accounting profession was not justifiable as a matter of law. The trial court thus did not err by directing a verdict against Wylie and KSW on their fraud and fraudulent-inducement claims. We overrule the Wylie parties' third issue.

### E. Simmons's fraudulent-transfer claim

The Wylie parties' fourth, sixth, and tenth issues involve Simmons's fraudulent-transfer claim. In their fourth issue, the Wylie parties contend that the trial court abused its discretion by submitting a question allowing the jury to find that Wylie had fraudulently transferred KSW's assets because no evidence supported the submission. *See* Tex. R. Civ. P. 278, 279. In their sixth issue, the Wylie parties argue that no evidence supported the jury's finding that Wylie had fraudulently transferred KSW's assets. In their tenth issue, they contend that the evidence supporting the jury's finding that Wylie had fraudulently transferred HMSW's assets was against the great weight and preponderance of the contrary credible evidence.[14] Because these three issues involve the jury's answers to a single question—whether Wylie fraudulently transferred KSW's and HMSW's assets—we address them together.[15]

---

[14]The Wylie parties do not challenge the jury's finding that KSW fraudulently transferred its and HMSW's assets.

[15]Simmons asserts that the Wylie parties waived these issues by submitting a proposed final judgment voiding the asset transfers in this case. For the reasons set out in footnote 9, we disagree.

The Wylie parties did not object to the submission of a question allowing the jury to find that Wylie had fraudulently transferred KSW's and HMSW's assets. We thus review the evidentiary sufficiency in light of the charge submitted.[16] *See Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001)). Here, the jury was asked whether Wylie had transferred KSW's and HMSW's clients, goodwill, member interests, and assets with the "actual intent to hinder, delay, or defraud any creditor." In determining such intent, the jury was instructed that it could consider, among other factors, whether

1. The transfer was to an insider.

2. Richard Wylie retained possession or control of the property transferred after the transfer.

3. The transfer was concealed.

4. Before the transfer was made, Richard Wylie had been sued or threatened with suit.

5. The transfer was of substantially all of Richard Wylie's assets.

6. Richard Wylie absconded.

7. Richard Wylie removed or concealed assets.

8. The value of the consideration received by Richard Wylie was not reasonably equivalent to the value of the asset transferred.

---

[16]The fraudulent-transfer question tracked the Uniform Fraudulent Transfer Act ("UFTA"). *See* Tex. Bus. & Com. Code Ann §§ 24.001, .002(7)(A), (12), .005(a)(1), (b); *see also* Comm. on Pattern Jury Charges, *supra*, PJC 105.25 & cmt.

9. Richard Wylie was insolvent or became insolvent shortly after the transfer was made.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. Richard Wylie transferred the essential assets of the business to a lienor who transferred the assets to an insider of Richard Wylie.

The jury was further instructed that an "insider" included

1. a relative of Richard Wylie or a general partner of Richard Wylie;

2. a partnership in which Richard Wylie is a general partner;

3. a general partner in a partnership in which Richard Wylie is a general partner; or

4. a corporation in which Richard Wylie is a director, officer, or person in control.

The jury was also instructed that "transfer" meant "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."

The Wylie parties argue that because the Purchase Agreement contemplated mergers, because no hard assets were transferred, and because any transfers were between affiliated entities, no evidence supported the jury's finding that Wylie fraudulently transferred KSW's assets. The Wylie parties similarly argue that the jury's finding that Wylie fraudulently transferred HMSW's assets was against the great weight and preponderance of the contrary credible evidence because (1) the value of Wylie's and Hagen's membership interests ($252,000) was calculated by Hagen, whose

only relationship with Bishop was a professional one; (2) Hagen sold his membership interest to Bishop based on that valuation; (3) the membership interests "included very substantial liabilities that minimized the opportunity to extract value from that interest"; and (4) there was no evidence of "the transfer of any hard assets of the type one might transfer to avoid a creditor."

Although the Wylie parties complain that the assets were not "hard assets," the jury question was not limited to whether Wylie had transferred "hard assets." The question—to which the Wylie parties did not object—asked whether Wylie had transferred KSW's and HMSW's "[c]lients, goodwill, member interests, [and] assets." Wylie testified that while this suit was pending, he—acting as KSW's sole owner—distributed KSW's clients to Center Street, which distributed them to him (Wylie). These clients included those purchased from Simmons & Associates and from other accountants. Wylie then transferred those clients to HMSW. At that time, Wylie owned 80% of HMSW, and Hagen owned the remaining 20%. Wylie's stepdaughter, Bishop, then bought Wylie's and Hagen's membership interests in HMSW for $252,000. Wylie agreed that this transaction was "basically a sale of all of the clients [he] had purchased in the past to [his] daughter."

With himself as an intermediate stop for the acquired clients, Wylie testified that he transferred roughly $2 million in assets from KSW to HMSW and that HMSW's total asset value was about $2.2 million. But Hagen valued HMSW at only

$252,000 by taking into consideration the value of HMSW's assets (clients and goodwill) and netting out HMSW's liabilities (a six-year $1.9 million lease obligation).

After the sale, Bishop was HMSW's sole owner and its managing member. She and Wylie orally agreed that he would continue working for HMSW as an independent contractor and would be paid $5,000 per week for his work. The HMSW clients for whom Wylie worked were billed through KSW (now essentially a shell with two employees, Wylie and his wife), and HMSW was KSW's only client.

According to Bishop, Wylie was "still a very active presence" at HMSW in August 2018. And even though almost three years had passed since the sale to Bishop, HMSW's website still stated that Wylie was HMSW's leader, CEO, and executive managing partner. The website did not reflect that Bishop was HMSW's managing member.

From this evidence, the jury could have concluded that while this suit was pending, Wylie transferred all KSW's clients, goodwill, member interests, and assets to Center Street, then to himself, and then to an insider—HMSW, a corporation that he controlled. He then transferred his 80% membership interest in HMSW to Bishop, his stepdaughter, which was sufficient for the jury to find that Wylie transferred his interest in HMSW to an insider.[17] The jury also could have concluded that Wylie did

---

[17]The jury was charged that an "insider" included Wylie's relatives. Wylie does not dispute that Bishop—his wife's daughter—is his relative. *See* Tex. Bus. & Com. Code Ann. § 24.002(11) (defining "relative" as used in UFTA to mean "an individual

31

not receive reasonably equivalent value for these transfers. Finally, the evidence showed that Wylie maintained control over KSW's and HMSW's clients, goodwill, member interest, and assets after the transfers and that those transfers were concealed.

Accordingly, we hold that the evidence was sufficient to support submitting a question allowing the jury to find that Wylie made these transfers with the actual intent to hinder, delay, or defraud any creditor (in this case, Simmons). Reviewing the evidence under the applicable standards of review, we conclude that (1) more than a scintilla of evidence supports the jury's finding that Wylie fraudulently transferred KSW's clients, goodwill, member interests, and assets, and (2) the credible evidence supporting the jury's finding that Wylie had fraudulently transferred HMSW's clients, goodwill, member interests, and assets is not against the great weight and preponderance of the contrary credible evidence. We thus overrule the Wylie parties' fourth, sixth, and tenth issues.

## F. Simmons's alter-ego allegations

In the Wylie parties' fifth issue, they argue that the trial court abused its discretion by submitting a question allowing the jury to find that Wylie was KSW's

---

related by consanguinity within the third degree as determined by the common law, a spouse, or *an individual related to a spouse within the third degree* as so determined, and includes an individual in an adoptive relationship within the third degree" (emphasis added)).

alter ego because no evidence supported that submission. In their seventh issue, the Wylie parties challenge the legal sufficiency of the evidence supporting the jury's finding that Wylie was KSW's alter ego.[18]

"A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations." *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). Alter ego, or piercing the corporate veil, is not an independent cause of action but is instead a means of imposing liability for an underlying cause of action. *Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (op. on reh'g) (citing *Wilson v. Davis*, 305 S.W.3d 57, 68 (Tex. App.—Houston [1st Dist.] 2009, no pet.)). Alter ego is a basis for disregarding the corporate fiction and holding shareholders, directors, and officers individually liable where a corporation is organized and operated as a mere tool or business conduit of another. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986).

Alter ego applies "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Id.* (citing *First Nat'l Bank in Canyon v. Gamble*,

---

[18]Simmons asserts that Wylie and KSW waived these issues by submitting a proposed final judgment finding them jointly and severally liable for the damages Simmons incurred as a result of KSW's breach of the Purchase Agreement. We disagree. *See supra* note 9.

132 S.W.2d 100, 103 (Tex. 1939)). An alter ego relationship may be shown from the total dealings of the corporation and the individual, such as evidence of the degree to which corporate and individual property have been kept separate; the amount of financial interest, ownership, and control the individual has maintained over the corporation; and whether the corporation has been used for personal purposes. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990); *Castleberry*, 721 S.W.2d at 272. "[A]n alter ego theory may be used to pierce the corporate veil and establish individual liability in connection with a claim arising from a corporate contractual obligation only if actual fraud was perpetrated primarily for the direct personal benefit of the individual." *Hong v. Havey*, 551 S.W.3d 875, 883 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing Tex. Bus. Orgs. Code Ann. § 21.223(a), (b)).

Here, the jury was charged in accordance with Texas Pattern Jury Charges as follows:

> Richard Wylie is "responsible" for the conduct of KSW CPA if
>
> KSW CPA was organized and operated as a mere tool or business conduit of Richard Wylie; there was such a unity between KSW CPA and Richard Wylie that the separateness of KSW CPA had ceased and holding only KSW CPA responsible would result in injustice; and Richard Wylie caused KSW CPA to be used for the purpose of perpetrating and did perpetrate an actual fraud on Dan Simmons primarily for the direct personal benefit of Richard Wylie.
>
> In deciding whether there was such unity between KSW CPA and Richard Wylie that the separateness of KSW CPA had ceased, you are to consider the total dealings of KSW CPA and Richard Wylie, including-

34

1. the degree to which KSW CPA's property had been kept separate from that of Richard Wylie;

2. the amount of financial interest, ownership, and control Richard Wylie maintained over KSW CPA; and

3. whether KSW CPA had been used for personal purposes of Richard Wylie.

Is Richard Wylie responsible for the conduct of KSW CPA?

*See* Comm. on Pattern Jury Charges, *supra*, PJC 108.1, 108.2; *see also* Tex. Bus. Orgs. Code Ann. § 21.223. The jury answered "yes."[19]

The Wylie parties argue that the trial court abused its discretion by submitting this question because other than "the bare fact" that Wylie had a financial interest in KSW, there was no evidence that (1) Wylie had a financial interest in, ownership of, or control of KSW; (2) there was unity between KSW and Wylie so that separateness had ceased; (3) it would be an injustice to hold only KSW liable; (4) Wylie caused the corporation to be used for perpetuating a fraud; and (5) Wylie perpetrated an actual fraud for his direct personal benefit. *See Austin Capital Collision v. Pampalone*, No. 03-15-00447-CV, 2016 WL 7187478, at *7 (Tex. App.—Austin Dec. 8, 2016, no pet.) (mem. op.) (citing Tex. Bus. Orgs. Code Ann. § 21.223(b); *Mancorp, Inc.*, 802 S.W.2d at 228; *Stewart & Stevenson Servs., Inc. v. Serv–Tech, Inc.*, 879 S.W.2d 89, 108 (Tex. App.—Houston [14th Dist.] 1994, writ denied)).

---

[19]In response to a separate question, the jury found that Wylie was responsible for HMSW's conduct under an alter-ego theory. The Wylie parties do not challenge this finding.

Here, Wylie was KSW's sole owner, and the total dealings between Wylie and KSW show that there was such unity between them that the separateness of KSW had ceased and that Wylie operated KSW as a mere business conduit for himself. As we detailed in analyzing the Wylie parties' fraudulent-transfer issues, Wylie used KSW to perpetuate an actual fraud on Simmons for Wylie's personal benefit by causing KSW to fraudulently transfer its clients to Center Street, then to Wylie, and then to HMSW before selling his 80% interest in HMSW to Bishop. Wylie now works as an independent contractor for HMSW, which pays him $5,000 a week for servicing some of the same clients he serviced through KSW before they were transferred to HMSW. And Wylie's work is billed through KSW. In other words, Wylie now derives a personal benefit from the assets he fraudulently transferred from KSW in an attempt to "hinder, delay, or defraud" a creditor. Moreover, holding only KSW responsible would potentially leave Simmons with an uncollectible judgment against the now-hollowed-out KSW for its breach of the Purchase Agreement.

Accordingly, we conclude that the evidence warranted the trial court's submission of this alter-ego question. And viewing this evidence in a light most favorable to Wylie, we conclude that there was more than a scintilla of evidence supporting the jury's finding that Wylie was in fact KSW's alter ego. We overrule the Wylie parties' fifth and seventh issues.

**G. Simmons's attorney's-fee claim**

The Wylie parties' eighth issue attacks the trial court's $195,000 attorney's-fee award, claiming that Simmons failed to segregate his fees between recoverable and nonrecoverable claims.[20] They argue that Simmons failed to segregate the fees incurred related to his breach-of-contract claim from those he incurred prosecuting his fraudulent-transfer claim and defending against Wylie and KSW's counterclaims, specifically those for injunctive relief to enforce the noncompetition provisions and those "based on fraud and related issues." The Wylie parties argue that because Simmons made no attempt to show that segregation was not required, the evidence was insufficient to support the attorney's-fee amount awarded to Simmons. Simmons counters that he was not required to segregate his fees because his claims were intertwined with his defenses against Wylie and KSW's counterclaims and defenses.

The extent to which claims can or cannot be segregated is often a mixed question of law and fact, but the need to segregate attorney's fees is a legal question that we review de novo. *See GR Fabrication, LLC v. Swan*, No. 02-19-00242-CV, 2020 WL 2202325, at *10 (Tex. App.—Fort Worth May 7, 2020, no pet.) (mem. op.) (citing *Enterprising Gals of Tex., L.L.C. v. Sprehe*, No. 02-17-00063-CV, 2018 WL 3580998, at *2 (Tex. App.—Fort Worth July 26, 2018, no pet.) (mem. op.);

---

[20]The Wylie parties objected to the attorney's-fees question at the charge conference based on Simmons's failure to segregate and thus preserved this complaint for our review. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991).

37

*AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 521 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g)). An attorney's-fee claimant must segregate legal fees incurred for claims for which fees are recoverable from those that are not. *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006)). "An exception exists only when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible." *Id.* (citing *Chapa*, 212 S.W.3d at 313–14). But a common set of underlying facts alone does not relieve a party of its duty to segregate; "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. "The duty to segregate fees applies unless a party meets its burden of establishing that the same discrete legal services were rendered in support of both recoverable and unrecoverable claims."[21] *GR Fabrication*, 2020 WL 2202325, at *10 (citing *Chapa*, 212 S.W.3d at 313–14).

"Texas follows the American rule on attorney's fees, which provides that, generally, 'a party may not recover attorney's fees unless authorized by statute or

---

[21]For example, efforts to defeat a counterclaim that would reduce or avoid liability on a recoverable claim may be considered intertwined. *See, e.g.*, *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007); *Hagan v. Pennington*, No. 05-18-00010-CV, 2019 WL 2521719, at *9 (Tex. App.—Dallas June 19, 2019, no pet.) (mem. op.); *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 (Tex. App.—Houston [14th Dist.] 2007, pets. denied) (op. on reh'g).

contract.'" *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 453 n.4 (Tex. 2016) (quoting *Wells Fargo Bank NA v. Murphy*, 458 S.W.3d 912, 915 (Tex. 2015)). Here, Simmons sued the Wylie parties for fraudulent transfer and Wylie and KSW for breach of the promissory notes and the Purchase Agreement, claims for which attorney's fees are recoverable. *See* Tex. Bus. & Com. Code Ann. § 24.013; Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). Wylie and KSW countersued Simmons for breach of the Purchase Agreement; unfair competition, misappropriation of name, and conversion; common-law fraud; fraudulent inducement; tortious interference; and breach of fiduciary duty. In addition to damages, they sought injunctive relief to enforce the Purchase Agreement's noncompetition provisions, which specifically provided that the prevailing party could recover its attorney's fees "[i]n the event of litigation regarding [the] covenants not to compete." Simmons could thus recover his fees for successfully defending against Wylie and KSW's counterclaims regarding the noncompetition provisions.

Here, Simmons's attorney testified that he billed approximately $195,000 in reasonable and necessary attorney's fees in prosecuting the case and enforcing Simmons's rights under the promissory notes and the Purchase Agreement.[22] He explained that he did not segregate "any of the fees from any other cause of action . . . because the case has always been about the promissory note, the covenant

_____

[22]Simmons's attorney did not offer his billing records into evidence.

39

not to compete, and the monies owed to [Simmons] that he was shortchanged." Simmons's attorney further explained that because "[t]he defendants brought tons of counterclaims in this case all because of the enforcement of the promissory notes in this case, . . . [he did] not segregate the fees." He opined that Wylie and KSW's counterclaims were "[p]retty much" "subsumed into a defense against [Simmons's] promissory note claims" and that Simmons had "been battling all of the counterclaims and all of the alleged defenses ever since [he initiated the litigation] based upon these promissory notes and also the monies that [he] had earned and were not paid."

We agree with Simmons that had this case involved just the breach of the Purchase Agreement, the promissory notes, and the noncompete provisions, he would not have been required to segregate his fees. As noted, Simmons's fees were recoverable on his claims for affirmative relief and for defending against Wylie and KSW's claims regarding Simmons's breach of the noncompetition provisions. Simmons would not have been required to segregate his fees incurred in overcoming Wylie and KSW's affirmative defenses and in defending against their counterclaims for breach of the Purchase Agreement, fraud, and fraudulent inducement because Simmons was required to overcome those defenses and claims to recover on his claims for affirmative relief. *See Chapa*, 212 S.W.3d at 314 ("For example, to prevail on a contract claim a party must overcome any and all affirmative defenses (such as limitations, *res judicata,* or prior material breach), and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those defenses was

unnecessary."); *7979 Airport Garage*, 245 S.W.3d at 507 ("[W]hen a defendant asserts a counterclaim that the plaintiff must overcome in order to fully recover on its contract claim, the attorneys' fees necessary to defeat that counterclaim are likewise recoverable."). But Wylie and KSW had additional counterclaims, and Simmons's attorney made no attempt to explain how the fees for the legal services necessary to defend against those counterclaims were recoverable or any evidence to show that those services helped advance Simmons's claims for affirmative relief. *See Chapa*, 212 S.W.3d at 313–14. Because Simmons offered no evidence to show that these efforts were intertwined, he did not carry his burden to show that segregation was impossible, and we must reverse the trial court's attorney's-fee award and remand the case for a new trial on attorney's fees. *See Kinsel*, 526 S.W.3d at 428. We thus sustain the Wylie parties' eighth issue.

## H. The jury's failure to find lost profits

The jury found that Simmons breached the five-year noncompetition provision but did not find that Simmons's breach caused KSW to suffer any lost-profit damages. The Wylie parties argue in their ninth issue that this failure to find is against the overwhelming weight of the evidence.[23]

---

[23]The Wylie parties do not challenge the jury's finding that Simmons did not breach the two-year noncompetition provision.

The five-year noncompetition provision—which prohibited Simmons from, among other things, soliciting or accepting any business from the clients listed on Exhibit A—expired at the end of July 2013. Wylie testified that Simmons's breach of this provision caused KSW to suffer $220,800 in lost profits.[24] He calculated this amount based on the gross revenues Simmons generated from 2012 through 2016 from the "30 or so clients that he admitted he took." Based on those historical revenues, Wylie then projected revenues from those clients from 2017 through 2021, based on the assumption that the clients would have stayed with his firm for at least 10 years.[25] Wylie then subtracted "avoided costs"—those costs that he did not incur as a result of not having to generate those revenues—to arrive at net lost profits, which he adjusted to present value.

Lost profits must be proved with reasonable certainty and by competent evidence. *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 860–61 (Tex. 2017). "Texas courts require that a plaintiff seeking damages based on lost profits from future business opportunities adduce evidence establishing that prospective customers would have done business with the plaintiff absent the defendant's misconduct." *Id.* at 861.

---

[24]The Wylie parties also had a damages expert testify at trial. The expert testified that he did not calculate KSW's lost profits.

[25]According to Wylie, the "average life of a client" for his firm is between 10 and 15 years.

Here, Simmons's former clients were free to seek accounting services from someone other than Wylie, and Wylie admitted that Simmons & Wylie assumed the risk of client attrition when it purchased Simmons & Associates. Wylie claimed that Simmons had solicited the 30 or so clients that Wylie had used to calculate lost profits but admitted on cross-examination that he lacked personal knowledge that Simmons had, in fact, solicited all of them. Simmons maintained that he did not solicit those clients and that they had contacted him to perform accounting work. At least two of those clients told Simmons that they had contacted him because they were having communication issues with Wylie's firm. And Wylie offered no evidence that any of the 30 clients he had used to calculate his lost profits would have done business with KSW absent Simmons's alleged misconduct. We thus conclude that the jury's failure to award KSW lost profits for Simmons's breach of the five-year noncompetition provision was not against the great weight and preponderance of the credible evidence. We overrule the Wylie parties' ninth issue.

### III. The Trial Court's Final Judgment

The Wylie parties' eleventh and twelfth issues challenge the trial court's application of the law to the jury's findings. In these two issues, they argue that the trial court erred by imposing joint and several liability against Bishop, KSW, and HMSW for the entire judgment amount.

## A. Bishop's joint and several liability

In their eleventh issue, the Wylie parties assert that the trial court incorrectly applied the law to the jury's findings by imposing joint and several liability against Bishop because "nothing in the jury's findings permits the imposition of such personal liability" and because there was no jury finding on the value of the transferred assets at the time of their transfer.

Simmons's only claim against Bishop was his fraudulent-transfer claim under UFTA. UFTA is "designed to prevent transfers of property with the intent to defraud creditors." *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied) (op. on reh'g). Under UFTA, a fraudulent transfer occurs when a debtor makes a transfer with the intent to hinder, delay, or defraud his creditors. *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(1). A defrauded creditor has several equitable remedies: (1) "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim"; (2) "an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings"; or (3) "subject to the applicable principles of equity and in accordance with applicable rules of civil procedure . . . any other relief the circumstances require." *Id.* § 24.008(a). These remedies, however, are subject to the limitations in Section 24.009, which provides protection for good-faith purchasers and for money damages for the lesser of the value of the transfer or the

44

amount necessary to satisfy the creditor's claim. *See id.* §§ 24.008(a), .009(a), (b). Under Section 24.009, a creditor can obtain a money judgment against the first transferee of the asset, the person for whose benefit the transfer was made, or a subsequent transferee. *See id.* § 24.009(b). In any proceeding under UFTA, the trial court may also award costs and reasonable attorney's fees that are equitable and just. *Id.* § 24.013.

The Wylie parties first complain that because there was no liability jury finding against Bishop, the trial court erred by entering judgment against her. *See* Tex. R. Civ. P. 301 (stating that the judgment must conform to the pleadings, the nature of the case, and the jury's verdict). We interpret this complaint as arguing that it was Simmons's burden to obtain a fact finding that Bishop was the first transferee, the person for whose benefit a transfer was made, or a subsequent transferee and that he failed to do so.

When an element of a claim is omitted from the jury charge without any objection to the element's omission and the trial court made no written findings on that element, the omitted element is deemed to have been found by the court in such manner as to support the judgment. Tex. R. Civ. P. 279; *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228–29 (Tex. 2011). Here, the Wylie parties did not object to either fraudulent-transfer question or to the omission of a question that would have allowed the jury to determine whether Bishop was the first transferee or a subsequent transferee. *See* Tex. R. Civ. P. 274, 278. There was no dispute at trial (and none on appeal) that Bishop was indeed a subsequent transferee of KSW's assets. In fact,

Bishop herself testified to purchasing HMSW and that "all of KSW's former clients resided in HMSW at that point in time." This evidence was legally sufficient to support a deemed finding that Bishop was a subsequent transferee of KSW's assets. *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 875 (Tex. 2017).

Next, the Wylie parties assert that Simmons could not recover money damages from Bishop because (1) there was no jury finding regarding the assets' value at the time they were transferred to Bishop, and (2) Bishop took the assets in good faith and for a reasonably equivalent value. *See* Tex. Bus. & Com. Code Ann. § 24.009(a), (b). The Wylie parties contend that given the jury's findings, the appropriate remedy would have been "avoiding and reversing the transfers altogether" under Section 24.008(a)(1). *See id.* § 24.008(a)(1) (providing that a creditor may obtain "avoidance of the transfer . . . to the extent necessary to satisfy the creditor's claim"). Simmons argues—as he did in his motion and supplemental motion for judgment in the trial court—that a judgment holding Bishop jointly and severally liable for the total damages amount is permissible under Section 24.008(a)(3)(C), which allows a trial court to award "subject to applicable principles of equity . . . any other relief the circumstances require." *Id.* § 24.008(a)(3)(C).

Section 24.008(a)(3)(C)'s broad language permits the recovery of money damages. *See Enshikar v. Zaid*, No. 14-18-00933-CV, 2020 WL 6203348, at *5 (Tex. App.—Houston [14th Dist.] Oct. 22, 2020, no pet.) (mem. op.); *see also McDill Columbus Corp. v. Univ. Woods Apartments, Inc.*, No. 06-99-00138-CV, 2001 WL 392061,

46

at *8 (Tex. App.—Texarkana Apr. 19, 2001, pet. denied) (not designated for publication) (concluding that money damages are recoverable under Section 24.008(a)(3)(C)). We have held that proof of a transferred asset's value is not required to support equitable relief under Section 24.008(a)(3)(C). *See Flores*, 161 S.W.3d at 756–57. But relief under Section 24.008 is "subject to the limitations in Section 24.009." Tex. Bus. & Com. Code Ann. § 24.008(a). Reading this language in conjunction with the limitations set out in Section 24.009, one of our sister courts has recently determined that money damages recoverable under Section 24.008(a)(3)(C) are "limited to the lesser of the value of the transfer or the amount of the claim." *Enshikar*, 2020 WL 6203348, at *5 (citing Tex. Bus. & Com. Code Ann. §§ 24.008(a)(1), (a)(3)(C), .009(b)).

Here, the jury awarded Simmons $26,412.20 in damages for KSW's breach of the Purchase Agreement and $758,528.57 in total damages for Wylie's two promissory-note breaches. The amount of Simmons's claim against KSW was thus $26,412.20, and the amount of his claims against Wylie was $758,528.57. *See* Tex. Bus. & Com. Code Ann. § 24.002(3) (defining "claim"). The trial court heard evidence that in December 2015, Wylie, as KSW's sole owner, transferred roughly $2 million in assets from KSW to Center Street to himself to HMSW; the value of KSW's assets exceeded the total amount of Simmons's claims against Wylie and KSW. Bishop received KSW's assets as a subsequent transferee, and the trial court could have reasonably concluded that she was not "a good faith transferee who took for value"

47

because even though HMSW was valued at $252,000 because of a large lease obligation, KSW's assets were still valued at roughly $2 million. *See* Tex. Bus. & Com. Code Ann. § 24.009(b)(2) (providing that money judgment may be entered against "any subsequent transferee other than a good faith transferee who took for value"). We thus conclude that "subject to the applicable principles of equity" the trial court did not err by holding Bishop jointly and severally liable for $784,940.77 (the total amount of Simmons's claims) under Section 24.008(a)(3)(C). We overrule the Wylie parties' eleventh issue.

**B. KSW's and HMSW's joint and several liability**

In their twelfth issue, the Wylie parties assert that the trial court incorrectly applied the law to the jury's findings by imposing joint and several liability against KSW and HMSW. The Wylie parties concede that the jury's findings support Wylie's and KSW's joint and several liability for the damages for which KSW was found liable ($26,412.20 for KSW's breach of the Purchase Agreement) but argue that the jury's findings do not support holding KSW and HMSW jointly and severally liable for the entire judgment amount ($758,528.57 for Wylie's breach of the promissory notes, plus $26,412.20 for KSW's breach of the Purchase Agreement). Simmons counters that the trial court did not err by holding KSW and HMSW jointly and severally for the entire judgment amount under the theory of reverse veil piercing because the jury found that KSW and HMSW were Wylie's alter egos.

48

Traditionally, a court pierces the corporate veil by holding a shareholder liable for the corporation's debt, "effectively placing the shareholder in the shoes of the corporation." *Yamin v. Carroll Wayne Conn, L.P.*, 574 S.W.3d 50, 66 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "In a reverse veil-piercing case, the roles are reversed, and it is the corporation that is held liable for the shareholder's debt or otherwise substituted for the shareholder." *Id.*; *see Clement v. Blackwood*, No. 11-16-00087-CV, 2018 WL 826856, at *5 (Tex. App.—Eastland Feb. 8, 2018, pet. denied) (mem. op.) ("Texas also allows the alter-ego doctrine to be applied in reverse; a corporation's assets can be held accountable to satisfy the liabilities of individuals who treated the corporation as their alter-ego."). Like direct veil piercing, reverse piercing is appropriate "where a corporation is organized and operated as a mere tool or business conduit of another" and "there is such 'unity between corporation and individual that the separateness of the corporation has ceased' and holding only the corporation or individual liable would result in injustice." *Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (op. on reh'g) (quoting *Castleberry*, 721 S.W.2d at 271).

Here, the jury was asked in separate questions whether Wylie was responsible for KSW's and HMSW's conduct. The jury answered "yes" to each question. Simmons did not request jury questions that would have enabled the jury to find (1) that either KSW or HMSW was responsible for Wylie's conduct or (2) that HMSW was responsible for KSW's conduct. Without such questions, there were no findings

49

that holding only Wylie liable would result in injustice or that either KSW or HMSW used Wylie for the purpose of perpetuating and did perpetuate an actual fraud on Simmons primarily for KSW's or HMSW's direct benefit. *Cf. Clement*, 2018 WL 826856, at *5–6 (concluding that a plaintiff must satisfy actual-fraud requirement in Texas Business Organizations Code Section 21.223(b) before the plaintiff can recover based on a reverse-veil-piercing theory). Likewise, there were no findings that holding only KSW liable would result in injustice or that HMSW used KSW for the purpose of perpetuating and did perpetuate an actual fraud on Simmons primarily for HMSW's direct benefit. Even utilizing a reverse-veil-piercing theory, there were no findings that would have enabled the trial court to hold either KSW or HMSW jointly and severally liable for the damages resulting from Wylie's promissory-note breaches or to hold HMSW jointly and severally liable for damages resulting from KSW's breach of the Purchase Agreement. Accordingly, we sustain the Wylie parties' twelfth issue.

## IV. Discovery Issues

In their thirteenth and final issue, the Wylie parties assert that "the trial court's erroneous discovery rulings compromised [their] ability to develop the merits of [their] case with respect to the scope of [Simmons's] breach of the non-competition provisions of the Purchase Agreement and the damages that arose from that breach." They generally complain that they repeatedly sought discovery from Simmons regarding the identity of the Exhibit A clients whom Simmons serviced in violation of

50

the noncompetition provisions but that Simmons failed to provide adequate interrogatory and production responses that would have revealed this information.

In the trial court, the Wylie parties complained about the trial court's discovery rulings in their new-trial motion and attached some of Simmons's discovery responses to the motion. These discovery responses included Simmons's objections to the Wylie parties' requests for production seeking Simmons & Associates of North Texas's invoice registers, time and billing records, and invoices for the years 2009 through 2017. But the appellate record does not contain any motions seeking to compel Simmons to respond to these three discovery requests nor does it contain any written rulings on those motions. The appellate record does include, however, a transcript from an April 2018 hearing on Simmons's discovery objections.

During that hearing, Simmons—consistent with his discovery objections and responses—stated that he had produced invoices for the approximately ten Exhibit A clients for whom he had worked after Wylie had stopped paying on the promissory notes. The trial court orally sustained Simmons's objections to the production requests seeking Simmons & Associates of North Texas's invoice registers, time and billing records, and invoices for the years 2009 through 2017. On appeal, the Wylie

parties challenge these rulings[26] and complain that Simmons did not produce invoices showing all the Exhibit A clients he had serviced until a month before trial.

We review a trial court's discovery rulings for an abuse of discretion. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 661 (Tex. 2009). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

As appellants, the Wylie parties had "the burden to bring forward an appellate record sufficient to enable us to determine whether the complaints of reversible error are substantiated." *Eagle Fabricators, Inc. v. Rakowitz*, 344 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The appellate rules require a trial-court clerk to

---

[26]To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must also get a ruling—either express or implied—from the trial court. Tex. R. App. P. 33.1(a)(2)(A), (b); *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002). The Wylie parties appear to be challenging Simmons's failure to respond to other discovery requests. But they have not pointed us to any motions to compel or any rulings on those motions, and we have found none. The Wylie parties thus have not preserved these complaints for our review.

include in the clerk's record copies of certain documents. *See* Tex. R. App. P. 34.5(a). But a motion to compel is not among those documents and must be requested to be included in the clerk's record. *See* Tex. R. App. P. 34.5(a), (b). The Wylie parties, however, did not ask the trial-court clerk to include the motion to compel, and as a result, we know only that the trial court orally sustained Simmons's objections to production requests seeking Simmons & Associates of North Texas's invoice registers, time and billing records, and invoices for the years 2009 through 2017. To the extent the Wylie parties are complaining that the trial court erred by denying a motion to compel these responses, without the motion they cannot show that the trial court abused its discretion. And based on the parties' statements and arguments during the hearing, the trial court did not abuse its discretion by orally sustaining Simmons's objections to the Wylie parties' production requests.

The Wylie parties admit that Simmons eventually produced invoices for all the Exhibit A clients for which he had worked. But they complain that Simmons did not do so until a month before trial, leaving them insufficient time to prepare for trial. To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A). If a party fails to do this, error is not preserved. *Bushell*, 803 S.W.2d at 712.

Here, the Wylie parties did not move to continue the trial or otherwise make a pretrial complaint regarding Simmons's delayed production. They did not raise this complaint until their new-trial motion. Because the Wylie parties failed to timely present this complaint to the trial court, we conclude that they have not preserved it for our review. *See* Tex. R. App. P. 33.1(a)(1)(A); *Bushell*, 803 S.W.2d at 712. We thus overrule the Wylie parties' final issue.

## V. Conclusion

Having sustained the Wylie parties' eighth issue—challenging Simmons's failure to segregate his attorney's fees—we reverse the part of the trial court's judgment awarding Simmons attorney's fees, and we remand for a new trial on attorney's fees. *See* Tex. R. App. P. 43.2(d). Having sustained the Wylie parties' twelfth issue—challenging KSW's and HMSW's joint and several liability—we reverse the trial court's judgment holding Wylie, KSW, HMSW, and Bishop jointly and severally liable for actual damages, taxable court costs, and interest and render judgment ordering that (1) Simmons take nothing from HMSW; (2) Simmons recover $26,412.20 in actual damages plus pre- and postjudgment interest on that amount from Wylie, KSW, and Bishop, jointly and severally; (3) Simmons recover $758,528.57 in actual damages plus pre- and postjudgment interest on that amount from Wylie and Bishop, jointly and severally; and (4) Simmons recover taxable court costs from Wylie, KSW, and Bishop, jointly and severally. *See* Tex. R. App. P. 43.2(c). Because we have

54

overruled the rest of the Wylie parties' issues, we affirm the rest of the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  December 31, 2020